# IN THE COURT OF APPEALS OF IOWA

No. 23-0953
Filed April 24, 2024

**IN THE INTEREST OF S.W.,**
**Minor Child,**

**M.M., Mother,**
        Petitioner-Appellant,

**E.S., Father,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Woodbury County, Mark Cord,
Judge.


        A mother appeals the denial of her petition to terminate the parental rights
of her son's father.  **AFFIRMED**.


        John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant.

        Timothy A. Scherle, Sioux City, for appellee.


        Considered by Ahlers, P.J., Langholz, J., and Carr, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2024).

**LANGHOLZ, Judge.**

After experiencing a mental-health episode, a father did not contact or visit his son for eight months. The mother then sought to terminate the father's parental rights, arguing the eight-month silence constituted abandonment. Yet the father was receiving mental-health treatment during this time, which precluded meaningful contact with his son. Given the relatively short period without contact and the medical condition that prevented it, we cannot say that the mother has met her heavy burden to prove abandonment by clear and convincing evidence. We thus affirm the district court's denial of the mother's termination petition.

I.

The mother and father have an eleven-year-old son. They separated in 2015, when their son was two. After the separation, the son lived with his mother and the father sporadically contacted him. In August 2019, a court entered a custodial order granting the mother sole legal custody and physical care of the son.[1] The order granted the father supervised visitation at least every other Saturday for five hours. Because of a domestic-abuse protective order prohibiting the father from any contact with the mother, the visits could be supervised by the mother's husband or the son's grandmother while the protective order remained in place.

At first, the father infrequently pursued visitation. But starting in mid-2020, the father regularly visited his son. The visits remained consistent through May 2022 and were usually supervised by the husband. The mother believed the son

---

[1] The father did not appear or make any filings in the custodial proceeding.

and his father got "along fine" during the visits, and the husband thought the visits went "pretty well." Along with paying child support—which was deducted from the father's disability benefits—the father sometimes bought his son gifts and clothes.

In March 2022, the mother and husband noticed a change in the father. During visits, the father sometimes made "off-the-wall comments that didn't make any sense." The husband feared the father was "becoming unstable" and felt the need to "keep a closer eye on him" during visits with the son.

The father has a history of mental illness. He was diagnosed with bipolar disorder as a teenager and more recently diagnosed with schizophrenia in 2018. But the father checks himself into the hospital when he believes he is entering "a manic state."

In May 2022, the father and son visited a museum, supervised by the husband. During a video presentation, the father became disruptive—loudly discussing being the next president. Then, while observing another part of the museum, the father roughly pulled his son's hand, causing the son to fall over. At that point, the son gave the supervising husband a prearranged hand signal, indicating the son was uncomfortable and wished to leave. So the husband ended the visit, angering the father.

After leaving the museum, the father physically confronted the husband. And the husband drew his gun.[2] A mail carrier passing by observed the encounter, helped the son get to the husband's car, and called 911. The father asked the

---

[2] The husband is a police officer, and the drawn gun was his service weapon. The husband testified he never pointed the gun at the father, but kept it pointed toward the ground.

husband, "Have you ever seen levitation before?" He then picked up a rock and said, "I'm going to levitate this rock through your head." The police arrived soon after, the father left the scene, and no report was filed.

The father acknowledged that he was indeed "getting kind of manic" during the museum visit. But he believed the husband drawing the gun exacerbated his condition. After the incident, the father sought in-patient care at two hospitals. He is now on a new medication, receives consistent medical care, and feels "balanced."

The father did not again request visitation. Nor did the father contact his son for any holidays or his birthday in the following months. According to the father, he was receiving treatment during this time and was not comfortable being around his son.

In January 2023—roughly eight months after the incident—the mother petitioned to terminate the father's parental rights under Iowa Code chapter 600A (2023). The mother alleged the father's prolonged absence constituted abandonment. A guardian ad litem filed a brief report supporting terminating the father's parental rights. Two months after the petition was filed, the father again requested visitation and had one visit with his son.

Following an evidentiary hearing, the district court denied the petition to terminate the father's parental rights. The court found that the mother had not proved abandonment—crediting the father's testimony that his absence was due to a medical condition and finding the father's "physical and mental health limitations" explained his absence. The court also held that it was not in the son's best interest to have his father's rights terminated. The court praised the father's

steps toward addressing his mental health, explaining that "[t]o his credit, he separated himself briefly from public interactions while he addressed his mental health concerns." And the court reasoned that while the father's "hurdles and those created by or contributed to by others do infrequently get in the way from time to time," he "had a bonded and meaningful relationship" with his son, and "this court is not ready to write out [the father] from [the son's] life." The mother appeals.

II.

Terminating parental rights is a two-step process. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). A petitioner must first show "clear and convincing" evidence that one or more grounds for termination exists. Iowa Code § 600A.8. The petitioner must then show that terminating a parent's rights is in the child's best interest. *Id.* § 600A.1. "Private termination proceedings under chapter 600A are reviewed de novo." *B.H.A.*, 938 N.W.2d at 232. Though not binding on us, the district court's fact-finding and credibility determinations inform our analysis and are entitled to weight. *Id.*

Beginning with the first step, the mother claimed only abandonment as a ground for termination. *See* Iowa Code § 600A.8(3). A parent abandons his child when, if the child is older than six months, the parent fails to "maintain[] substantial and continuous or repeated contact with the child." *Id.* § 600A.8(3)(b). Relevant here,[3] substantial and continuous contact may be shown by (1) "[v]isiting the child at least monthly when physically and financially able to do so and when not

---

[3] The mother does not claim that the father abandoned their son by failing to "contribut[e] toward support of the child of a reasonable amount, according to the parent's means." Iowa Code § 600A.8(3)(b).

prevented from doing so by the person having lawful custody of the child"; or (2) "[r]egular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child." *Id.* § 600A.8(3)(b)(1)–(2).

Under these facts, we do not find clear and convincing evidence of abandonment. While the father indeed failed to visit or communicate with the child for eight months, the district court found the father's testimony about his medical condition credible. In particular, the father credibly testified that his absence was due to receiving mental-health treatment. *See In re E.S.*, No. 16-0066, 2016 WL 7403746, at *3 (Iowa Ct. App. Dec. 21, 2016) (considering that lack of visitation was caused by "ongoing mental-health conditions" in finding that petitioners had not proved abandonment and reversing the district court). Once the father's condition stabilized, the father contacted family members and sought to resume visiting his son. The father regularly visited the son for over a year before the mental health event, and after finding success on a new medication, had a positive visit with the son. This is not enough to meet the mother's heavy burden.

Of course, "[i]t is now incumbent on [the father] to take advantage of this opportunity" and maintain a substantial relationship with his son going forward. *Id.* But on this record, and informed by the district court's credibility determinations, we agree there is no clear and convincing evidence to show the father abandoned his son. So we need not proceed to the second step best-interest analysis. The district court properly denied the mother's termination petition.

**AFFIRMED.**